**In re C.H. BUTCHER, Jr., Debtor.**

**In re Shirley R. BUTCHER, Debtor.**

**Bankruptcy Nos. 3–83–01008, 3–83–01401.**

United States Bankruptcy Court, E.D. Tennessee.

March 27, 1985.

Weinberger, Weinstock, Sagner, Stevan & Harris, Neil S. Melnick, Baltimore, Md., Gilreath & Associates, James R. Moore, Knoxville, Tenn., for James R. Martin, trustee.

Jeffrey L. Hall, Jacksboro, Tenn., for Cecil H. Butcher, III.

Morton, Lewis, King & Krieg, John K. King, Deborah Stevens, Barbara J. Lukes, Knoxville, Tenn., for Federal Deposit Ins. Corp.

John W. Gill, Jr., U.S. Atty., Guy W. Blackwell, John Littleton, Asst. U.S. Attys., Knoxville, Tenn., for U.S., amicus curiae.

CLIVE W. BARE, Bankruptcy Judge.

I

On February 19, 1985, the trustee for the debtors' estates, James R. Martin, filed a motion seeking approval of four agreements to compromise and settle claims.[1] Notice of a hearing on the trustee's motion was given to creditors of both estates. Only one creditor, Federal Deposit Insurance Corporation (FDIC), appeared. However, the United States of America appeared as an amicus curiae.

The subject of the first agreement is a condominium in Key Biscayne, Florida. Cecil H. Butcher, III, the debtors' son, has offered to purchase the trustee's interest in the condominium without warranty. The consideration for the purchase of the condominium, presently appraised at $280,000, is: (1) the assumption of an existing first mortgage debt of approximately $80,000; (2) a non-interest bearing $140,000 promissory note, secured by a second mortgage, providing for payment of $70,000 within one year of closing and $70,000 within two

---

1. One agreement is actually a real estate sales contract not involving any dispute.

years of closing; and (3) approximately $43,000 cash to be paid upon closing. The trustee is willing to accept less than the appraised value due to the present "soft market" for condominium properties in southern Florida.[2] Further, the trustee wishes to avoid incurring any expense in connection with the condominium.[3]

The second agreement involves the trustee's claim to rights in certain luxury automobiles. According to the trustee's agreement with Shirley Butcher and Sco/Cor, Inc., a Florida corporation, C.H. Butcher, Jr. leased a Rolls Royce automobile in December 1981 from the Bank of Commerce. Upon default, Shirley Butcher paid $50,000 and B & B Properties Ltd. paid $69,000 to the Bank of Commerce. Title to the Rolls Royce was issued in the name of Sco/Cor, which in turn sold the vehicle to Michael Adler in exchange for his $60,000 promissory note and $30,000 cash. Although the trustee contends the Rolls Royce is property of the debtors' estates, Shirley Butcher maintains the vehicle was legally and properly sold to Adler by Sco/Cor. The trustee also asserts rights to three other automobiles and a promissory note to Sco/Cor in the amount of $8150 from Zane Daniels. Shirley Butcher denies ownership of any interest in these three automobiles or the Daniels note. In settlement of the trustee's claims, Sco/Cor agrees to: (1) pay $30,000 cash; (2) assign to the trustee Adler's $60,000 note, having an unpaid balance of between $52,000 and $53,000; and (3) transfer to the trustee Sco/Cor's interest in the proceeds from the Daniels note, previously deposited in the court's registry, totaling approximately $8900 including interest. The trustee represents he will receive approximately $92,000 under the second agreement and that the maximum recovery on his claims, excluding costs and expenses, is $132,000.

■ The trustee zealously recommends court approval of both the condominium sale and the "automobile claims" agreements. FDIC, principal creditor of the C.H. Butcher, Jr. estate and a holder of substantial claims against the Shirley Butcher estate, concurs, apparently wholeheartedly,[4] in the trustee's recommendation. No creditor of either estate has interposed an objection to either agreement. At the urging of the trustee, the representative of all creditors, and relying upon the trustee's recommendation and FDIC's concurrence, as well as the absence of objection by any creditor, the court approves the trustee's settlement agreement with respect to the automobiles.

■ However, the court declines to approve the agreement for the proposed condominium sale. Presumably, the appraiser's valuation of the condominium takes into account the current market conditions.[5] The present value of the consideration offered by the debtors' son ($244,000) approximates eighty-seven (87) percent of the current appraised value ($280,000).[6] A private sale of property in a bankruptcy case to a debtor's relative for *less than fair market value* should not be approved

2. The Key Biscayne condominium was appraised at $340,000 in 1984 by the same appraiser who recently submitted a current appraisal of $280,000. Also, the trustee listed another condominium, located in Stuart, Florida, with a realtor some six months ago. As of March 14, 1985, no one had expressed any interest in purchasing the second condominium, according to the trustee's attorney.

3. The monthly first mortgage payment is $1262; an estimated monthly utility charge necessary to prevent mildew damage is $120; annual property taxes are approximately $5500; condominium fees and insurance premiums present additional expenses.

4. John King, an attorney for FDIC, observed that luxury automobiles and condominiums are often sold for a bargain price because individuals who can afford such items ordinarily purchase them new. According to King, the purchase price of such luxury items may be quite different from the appraised value.

5. See note 2, *supra*, and accompanying text.

6. According to the trustee's attorneys, the present value of the $140,000 note offered by C.H. Butcher, III is $121,000.

absent a conclusive showing that market value cannot be obtained.[7]

## II

■ As originally submitted, the two remaining agreements, the "Preferred Stock Agreement" (a/k/a the Red Gate agreement) and the "Red Wind Agreement," recite in part:

6. The Trustee acknowledges that Mr. Butcher, III, through his attorneys and others, during the past year has engaged in good faith negotiations with the Trustee to resolve all claims by the Trustee against him and entities owned by him and has cooperated with the Trustee and, to the Trustee's knowledge, has not acted to hinder, delay or defraud the Bankruptcy Estates of C.H. Butcher, Jr. and Shirley R. Butcher.

7. Trustee has served Mr. Butcher, III with an Order Requiring Attendance and Testimony at 2004 Examination and Production of Documents; in response thereto Trustee has obtained testimony and documents. Trustee releases Mr. Butcher, III and Red Gate from further obligations to respond to such Order, and agrees not to seek or obtain any additional discovery orders.[8]

At the hearing on the trustee's motion for approval held March 13, 1985, the court inquired about the reason for these provisions. Neal Melnick, an attorney for the trustee, advised the court that these provisions, included at the request of attorneys for Cecil H. Butcher, III, formed part of the consideration for the two agreements. According to Melnick, the provisions are accurate and no reason exists not to accede to their inclusion in the Red Gate and Red Wind agreements. Representing FDIC, Deborah Stevens stated that from its standpoint FDIC sees no problems with the inclusion of these provisions and does not really care whether or not the language is included in the settlements.

On March 12, 1985, the day preceding the hearing on the trustee's motion, the United States filed a motion for leave to file, and a memorandum as, amicus curiae. Formal intervention was not requested. Guy Blackwell, Assistant United States Attorney, stated during the March 13th hearing that the United States felt obliged to file a memorandum as an amicus curiae because the quoted language in the Red Gate and Red Wind agreements conflicts with the facts. According to Blackwell, Cecil H. Butcher, III has refused to provide the trustee with records properly subpoenaed and failed to offer any excuse for the nonproduction. Further, according to Blackwell, Cecil H. Butcher, III, asserting the Fifth Amendment privilege against self-incrimination some sixty-four (64) times, repeatedly refused to answer the trustee's questions at a deposition proceeding. Jeffrey Hall, appearing on behalf of Cecil H. Butcher, III, did not challenge or controvert Blackwell's representations.

Although it is suggested that the court's approval of the agreements, inclusive of the provision regarding cooperation and an absence, to the trustee's knowledge, of acts by Cecil H. Butcher, III to hinder, delay, or defraud creditors, would not amount to an "imprimatur," this court categorically refuses to approve any settlement agreement which includes inaccurate or misleading provisions. Under the facts presented to the court, the agreement by the trustee and his attorneys to an acknowledgement of cooperation is simply not supported by the records.

At the conclusion of the March 13th hearing the court declined to approve either the Red Gate or the Red Wing agree-

---

7. When asked about his familiarity with the March 1984 condominium purchase option agreement between the trustee and himself, C.H. Butcher, III answered: "No, I'm not familiar with it, but I understand there was an option to purchase that took place. That's as much as I know on it." Discovery Deposition of C.H. Butcher, III at 111 (September 18, 1984). Further, when asked if he knew the option price,

C.H. Butcher, III stated: "At one time I was told, but I don't remember exactly." *Id.*

8. Identical provisions in the Red Wind agreement are numbered as paragraphs 9 and 11, except that "Red Gate" is deleted in paragraph 11 of the Red Wind agreement.

ment. On the following day, March 14, 1985, the two agreements, without the two paragraphs quoted hereinabove, were re-submitted by the trustee.

### III

■ The trustee holds preferred stock of Red Gate Quarterhorses, Inc. (Red Gate) in the face amount of $3,000,000. This stock was issued to C.H. Butcher, Jr. in consideration of capital contributions. Cecil H. Butcher, III is president and one hundred (100) percent owner of the common stock of Red Gate. The rights related to ownership of the preferred stock have not been outlined by the trustee; the value of these rights is also not a matter in the record before the court. According to the trustee, Red Gate has never made a profit nor paid a dividend.

In exchange for an option to purchase, for a nominal amount, forty-five (45) percent of the stock in George Washington Federal Savings and Loan Association (GWFSL), a federal savings and loan institution located in upper East Tennessee, the trustee proposes to release Cecil H. Butcher, III and Red Gate from any claim arising from the ownership of the Red Gate preferred stock. The release extends to all claims the trustee "might assert as a shareholder or beneficiary of Red Gate ... and all claims arising from the operation and management of Red Gate...." The trustee and FDIC represent that the consideration to be received exceeds the expected recovery even if the trustee succeeds in causes of action related to Red Gate. But the value of the GWFSL stock is not reported by the trustee. Indeed, when the trustee requested approval of the Red Gate agreement, he and his attorney had not completed a review of the GWFSL books and records.

Faced with a lack of material information, the court cannot independently determine whether the Red Gate agreement is in the best interest of the C.H. Butcher, Jr. estate. Numerous questions pertaining to the management of Red Gate's financial affairs, including the disposition of sizeable sums of money, are unanswered. Accordingly, based on the present record, the court must deny approval of the Red Gate agreement.

The record reflects that Red Wind, Inc. is a Florida corporation. As of June 20, 1983, Shirley Butcher was president and Cecil H. Butcher, III was apparently secretary of Red Wind. However, when asked in September 1984 about Red Wind, Cecil H. Butcher, III stated he had heard the name but to the best of his knowledge he was not an officer, director, shareholder, or creditor of Red Wind. He now contends that he has a $400,000 claim against Red Wind.

The trustee asserts ownership rights to certain promissory notes allegedly purchased by C.H. Butcher, Jr. from the Bank of Cumberland. Red Wind may claim some interest in the same notes. The trustee also asserts ownership of a Red Wind bank account with a balance of approximately $50,000. In settlement of the trustee's turnover claims against him, Cecil H. Butcher, III proposes to disclaim his interest, if any, in Red Wind in favor of the trustee and to waive his claim for repayment of monies loaned to Red Wind. In exchange, the trustee proposes to release Cecil H. Butcher, III "with regard to Red Wind and the turnover claims of Trustee."

When questioned in October 1984 by the trustee's attorney about Red Wind, Cecil H. Butcher, III again denied knowing anything about Red Wind. Confronted with a Red Wind corporate resolution, dated June 20, 1983, purportedly bearing his signature, Cecil H. Butcher, III refused to acknowledge or deny the signature. He asserted his constitutional privilege against self-incrimination in response to several questions about Red Wind, including whether he participated in an alleged disbursement to his father on July 11, 1983, of Red Wind funds in the amount of $97,000.

The trustee's proposed release is absolute with respect to Red Wind-related claims against Cecil H. Butcher, III. Based on the present record the court cannot determine whether the Red Wind agreement is in the best interest of credi-

tors. Hence, neither can the Red Wind agreement be approved by the court.

In summary, the agreement between the trustee, Shirley Butcher, and Sco/Cor, Inc. is APPROVED. The agreement for the sale of the condominium and the agreements relating to the trustee's Red Gate and Red Wind claims are DISAPPROVED.

IT IS SO ORDERED.